**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIM A. DZURKO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 03235 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN,[1] Commissioner | ) | Judge John J. Tharp, Jr. |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Kim Dzurko seeks judicial review of the Commissioner of Social Security's determination that she is not disabled, and therefore ineligible to receive disability insurance benefits. Now before the Court are the parties' cross-motions for summary judgment. Dkts. 17, 20. For the following reasons, Dzurko's motion is granted, the Commissioner's motion is denied, and the case is remanded to the Commissioner for further proceedings.

## BACKGROUND

### A.     Procedural Background

On February 23, 2009, Dzurko filed a claim for a period of disability and to receive disability insurance benefits with the Social Security Administration, alleging that she became disabled on February 9, 2009 and is no longer able to work. The Commissioner denied her claim and her request for reconsideration. Dzurko requested and received a hearing before an administrative law judge ("ALJ"). After Dzurko waived her right to representation and

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Carolyn W. Colvin, who became the Acting Commissioner of Social Security on February 14, 2013, is substituted for Commissioner Michael J. Astrue as defendant.

proceeded *pro se* at the administrative hearing, the ALJ denied her claim. The Social Security Council subsequently denied her request for review, leaving the ALJ's decision as the final decision of the Commissioner. *See Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Dzurko filed this action seeking review of that final decision pursuant to 42 U.S.C. § 405(g).

### B.     Factual Background

Dzurko was born on May 5, 1969, and was 39 years old when she filed for disability. R. 28.[2] She has a GED, a certified nursing assistant ("CNA") license, and a food service license. She lives in Wilmington, Illinois, with her husband and 16-year-old nephew. Dzurko began working at age 16; from 1998 through 2001, she had her own restaurant at a flea market. Between 2001 and 2009, Dzurko worked as a CNA and home health care provider. She attests that since February 9, 2009, she has not been able to work because of limitations related to, among other ailments, chronic disabling foot pain, arthritis, somatic dysfunction, degenerative joint disease, avascular necrosis, obesity, and the effect of her medications.

### C.     Medical Evidence

Dzurko has seen several doctors and undergone numerous clinical tests to diagnose and treat her pain and other ailments. Her most severe pain-related issues affect her right foot and ankle, on which she had surgery in 2003 following an injury. R. 65, 74. The Center for Foot and Ankle Surgery, where the surgery was performed, reports that she has not been seen by the office since 2006. R. 431. Records from Morris Hospital show that Dzurko visited its pain management center and reported pain in her feet and ankles in 2006. R. 293. Dr. Maria Estilo prescribed medication and diagnosed her with "1. [c]hronic right foot pain, status post right foot surgery, 2/15/05, more somatic, CRPS controlled[; and] 2. [c]ystic changes, right lateral cuneiform bone,

_____

[2] Citations to R. refer to pages in the administrative record, which was filed as Dkt. 13.

talar dome, bilateral cystic changes in the inferior aspect of the talus; osteoarthritic changes of the right posterior talocalcaneal joint; hallux valgus deformities, bilateral feet (CT scan, 2/9/04)." R. 293. Clinical tests conducted in 2007 revealed arthritis, a subchondral cyst, and cystic changes in Dzurko's feet and ankles. R. 328–29.

Dzurko also saw Dr. Gary Golden for pain management. R. 72, 212, 335–400, 412–27. His notes indicate that on February 5, 2008, Dzurko injured her back and neck when she fell down stairs because her right ankle gave out. R. 382. She was then instructed to stop any activity that causes or increases pain. R. 386. On July 9, 2008, she "turned, twisted, felt a pop in the right foot" while at work and was subsequently placed on crutches. R. 369. Diagnostic imaging tests from March 2009 indicated degenerative changes in Dzurko's right foot that raised the suspicion of avascular necrosis. R. 330, 333–34. Dzurko also consulted an orthopedic surgeon in March 2009, who reported that Dzurko's MRI results indicated no avascular necrosis but possible secondary degenerative cysts. R. 451, 453. The surgeon noted, "I am hesitant at offering her any surgical intervention currently and I do believe that it is her subtalar joint which is causing the majority of her symptoms. However, she has a lot of supratentorial overlap and her back pain and symptoms, including those in her upper extremities, sometimes predominate." R. 454.

Since September 13, 2010, Dzurko has been treated at the Pain Centers of Chicago, LLC, by Dr. Mauricio Morales and others. The records from this practice indicate that her ankle condition started several years ago after a trauma and associated ankle surgery in 2003. R. 461. Her symptoms include pain that "radiates from her right ankle into her right knee and is sharp" and a "cold sensation in her foot." R. 461. Treatment notes describe her pain as a "sharp burning constant throb" that varies in intensity, is improved by medication and lying down, and is exacerbated by activity. R. 465. Records show that her coordination was intact and that MRI

results showed areas of avascular necrosis. R. 466. According to treatment notes, cortisone injections have diminished Dzurko's pain. Dzurko's chart indicates that she was five feet three inches tall, weighed 183 pounds, smoked, had a scar on her right ankle, and had some atrophy of her right foot. R. 471. At some appointments she reported that her pain medications worked well without side effects and at others she reported that they did not help. R. 467, 469. Records show that her treatments have included lumbar sympathetic injections, cortisone injections, physical therapy, orthotics, and medication. R. 461. As of January 2011, her medication regimen included Mobic, Norco, Soma, Elavil, and Zonegran. Dr. Morales concluded that "[d]espite these medications, Kim suffers from chronic pain on a daily basis and is limited in prolonged ambulation or standing on her foot," and that "[h]er activity level is limited" by her symptoms. R. 461. According to these records, her condition has "resulted in chronic right ankle pain with a neuropathic component and possible Complex Regional Pain Syndrome." R. 461, 470. The administrative record does not include any medical records from Dzurko's podiatrist, Dr. Paolucci, who referred her to the Pain Centers of Chicago. R. 261, 483–85.

On August 3, 2009, Dzurko saw Dr. Sarat Yalamanchili for a consultative examination for the State of Illinois Bureau of Disability Determination Services ("DDS"). R. 401. Dr. Yalamanchili's diagnostic impression was recorded as, "1. [r]ight foot pain, possibly related to history of avascular necrosis and surgery[;] 2. [l]ow back pain[;] 3. [r]estless leg syndrome." R. 402–03. The summary of that examination noted Dzurko's "history of avascular necrosis of the feet, right foot surgery, restless leg syndrome, and low back pain." R. 402. It also described Dzurko's symptomology as including "pain in both of the feet unable to walk more than 50 feet and unable to drive." R. 402. According to the summary, Dzurko had a "right side limping gait with no need for any cane during gait examination." R. 402.

Dr. Francis Vincent, another DDS consulting physician, completed a "Physical Residual Functional Capacity Assessment" of Dzurko's health. R. 404. Dr. Vincent never treated or examined Dzurko; he based his assessment on a review of her medical records as they were compiled in August 2009. R. 404, 411. Dr. Vincent concluded that Dzurko could stand or walk for a total of two hours in an eight-hour workday, sit with normal breaks for about six hours in an eight-hour workday, occasionally lift ten pounds, frequently lift less than ten pounds, and engage in only limited pushing or pulling with the lower extremities. R. 405. Dr. Vincent further concluded that Dzurko could occasionally climb ramps, stairs, ladders, ropes or scaffolds and that she had no other postural or other limitations. R. 406–08. Dr. Vincent indicated that he viewed Dzurko's statements to be "partially credible" and noted that she "[h]elps take care of pets, does painting, sewing." R. 409. Dr. Charles Wabner revised Dr. Vincent's assessment on February 27, 2010, to note that Dr. Golden indicated Dzurko was doing well on January 18, 2010, and that "[t]here is no worsening in condition from initial assessment." R. 430.

Dzurko also has a history of heart disease. In 1990, she had cardiomyopathy due to severe toxemia following her pregnancy. R. 444. Records indicate that the cardiomyopathy has been in remission since 2003. R. 444. Dzurko went to the Riverside Community Health Center on February 5, 2009, complaining of palpitations, panic attacks, stress, sweating, and hot flashes. R. 444. Treatment notes indicate that "Patient cries easily and is easily upset. Patient feels like she isn't herself. She doesn't feel like answering the phone. Patient is also having foot cramps in her right toes." R. 444. She was prescribed Xanax and underwent several tests. R. 445. She was seen again on February 9, 2009; her Holter monitor report was normal. R. 315, 319, 327.

**D.     The Administrative Hearing**

By the time of the January 18, 2011, administrative hearing, Dzurko was 41 years old.

R. 55. At the hearing, the ALJ addressed the topic of Dzurko's right to counsel, stating:

> Now I see that you're not represented by counsel. Before we go further I must ensure in the record that you understand your rights to representation. You have the right to be represented by an attorney or a non-attorney of your choosing.
>
> A representative can help you obtain information about your claim, can submit evidence, explain medical terms, help protect your rights, and may make any requests or give any notice about the proceedings before me. A representative may not charge a fee that is not approved by the [S]ocial [S]ecurity [A]dministration.
>
> If you appoint a representative you may be responsible for certain expenses such as obtaining and copying medical records. There are some legal services that offer legal representation free of charge if you satisfy their qualifying requirements.
>
> You do have the right to proceed without a representative. If you do so, I will obtain any relevant medical information or non-medical records, and I will question you at the hearing. Nevertheless, a representative can present your evidence in a way that is most favorable to your case.

R. 46–47. Dzurko then indicated that she wished to proceed without counsel and signed an acknowledgement letter that states: "I have been advised, and I understand, that I have the right to be represented in this proceeding by an attorney or by any other qualified person of my choice. I have considered this matter, and have decided to waive my right to such representative, and wish to proceed without representation." R. 152. The ALJ asked Dzurko if she had read her file and whether additional relevant records existed. R. 47–48. Dzurko indicated that MRI records might be missing that show she has RSD (reflex sympathetic dystrophy) and that she was still having tests done. R. 48–49.

Dzurko then answered the ALJ's questions about her heart troubles, which date back to 1990 and have included toxemia, cardiomyopathy, and irregular heartbeats. R. 46–47, 49. Dzurko explained that "everything went back to normal, though, about five years later." R. 51. Since approximately 1995, she has only occasional episodes related to her heart trouble. She

stated that her last visit to a physician related to heart problems was in July 2010, when went to the emergency room and stayed overnight after having chest pain. R. 50, 67.

Dzurko testified that her primary concern in applying for disability is the pain in her feet, which she stated can range from her hip to her toes but is "usually in [her] knees and [her] ankle and [her] feet." R. 50, 70. She stated that she stopped working when she could no longer drive or walk, a period that she says began on February 9, 2009, when she discovered that she could not hold her vehicle's brake down while driving home from work. R. 56–57. She called her husband to pick her up and since that date has neither driven a vehicle nor worked. R. 57. She testified that since September 2010, she has received treatment at the Pain Center of Chicago, where she now goes every two months. R. 68. She listed the problems with her feet to include avascular necrosis, RSD, a cyst on one of the nerves in her foot, aching bones, an inability to maintain or control the temperature in her feet, arthritis, and restless legs syndrome. R. 70, 72. Dzurko's testimony about the onset of her RSD was somewhat unclear. She testified that she was first diagnosed with RSD in September 2009 by Dr. Gary Golden following an MRI and that the diagnosis was confirmed by three other doctors, but she also linked her RSD to surgery she had in 2003 on her right ankle. R. 74. After that surgery, she said, her foot or ankle "woke up instantly in pain" like it was "on fire." R. 74. She subsequently began receiving spinal injections for pain and declined to have similar surgery on her left foot. R. 74–75. Dzurko testified that she takes several medications daily, including Soma, Zonegran, Elavil, and Mobic. R. 68–70. The side effects include drowsiness. R. 68. She testified that even though she takes medications, she is still in pain. R. 73. Other treatments she listed receiving include spinal injections, physical therapy, using orthotics in her shoes, and shock therapy. R. 69–70, 72. She previously took Mirapex, but stopped in November or December of 2010 due to its side effect of making her

want to gamble. R. 81. Dzurko said she is hesitant to try spinal surgery to insert something to block pain from going from her foot to her brain because if she fell, she would not necessarily know if she hurt herself. R. 69. She had a cane with her at the hearing. R. 72.

Asked to describe her typical day, Dzurko said it takes her two hours to get up and leave her bedroom. R. 75. She testified that she can shower and dress herself, but that family members help her with the dishes, cooking, and laundry. R. 76. She stated that she does a lot of sitting in the chair in the kitchen and that she doesn't carry anything because she falls a lot. R. 76. She stated that each day she has to stop, lie down, wrap her feet in a heating pad, and raise her feet in the air due to her circulation issues and RSD. R. 76–77. According to Dzurko, she spends about five to six hours a day with her feet raised. R. 77. Her daily activities include watching six to seven hours of television, listening to the radio, and trimming the nails on her two four-pound Chihuahua dogs. R. 77–78. Her hobbies are painting and sewing, but that she only pursues the activities once in a while due to her depression. R. 80. She testified that she can stand for about ten minutes before she needs to sit down. On a good day, she stated that she can walk between 100 and 150 feet before needing to sit down and rest; on a bad day it is closer to 50 feet. R. 79. She described herself as jittery and in pain; she reported being able to sit off and on for about five to ten minutes at a time. R. 79. She indicated that she had been trying to quit smoking for the two months preceding the hearing. R. 82. Other than to attend the administrative hearing, she reported that she leaves her house only to go to the doctor's office. R. 75.

Dzurko described her employment history beginning in 1998, when she had a food service license and ran her own restaurant on weekends in a flea market for three years. R. 60. In this job, she testified that she spent most of her time sitting at the register. R. 64. She would also spend about three hours doing prep cooking on Fridays. R. 64. From 2001 to 2005, she worked

as a CNA for Quality Home Health Care, which would dispatch her to houses where people needed care. R. 60. She explained that her position there involved a lot of driving. R. 62. Sometimes she lifted or rolled her patients, but she stated that she refused to lift "two-assist" patients out of concern for dropping them on her own. R. 62, 64. From 2005 to 2008, Dzurko worked for Embassy as a midnight supervisor, where she oversaw CNAs and checked in with patients on the status of care given by nursing assistants and nurses. R. 57, 60. She left her position at Embassy in 2007 temporarily due to issues with the administration and worked in home health care on her own, before being invited back in 2008 to work as a part of the Embassy administration. R. 58. While working at Embassy, Dzurko testified that she would sometimes assist CNAs with lifting patients, though the CNAs would often ask another person for help. She stated, "toward the end, you know, I was limping more and tripping over my own feet." R. 61. Dzurko's office at Embassy was on the floor on which her residents were located. She testified that she could sit down "for, like, five minutes at a time," for a total of about two to two and a half hours out of an eight-hour shift. R. 61–62. The rest of the time, Dzurko reported that she walked on the job. R. 62.

Dzurko's husband testified that in 2009, his wife began having foot and ankle symptoms such as tiredness, weakness, and falling over. R. 84. He stated that at that point, she developed a fear that she wouldn't be able to perform her duties at work in management at the nursing home. R. 84. After the incident where she was unable to hold down the brake in her vehicle, Mr. Dzurko helped her compose a resignation letter. R. 85. According to Mr. Dzurko, his wife then pursued doctors to find out what was going on with her symptoms except during a period in June 2009, in which her problems were put on a back burner when Mr. Dzurko was diagnosed with stage three pancreatic cancer, had surgery, then dealt with numerous post-surgical complications.

R. 85–87. During that period, Mr. Dzurko testified that his wife maintained his IV and administered medications to him at home. R. 87. His condition improved in February or March of 2010, at which point the couple returned their attention to his wife's medical issues. R. 88. Mr. Dzurko attested that he drives his wife to her medical appointments. R. 88.

Abby May, a vocational expert ("VE"), listened to the testimony of Dzurko and her husband and then testified over the telephone about Dzurko's employment history and prospects. R. 89. VE testimony helps to determine whether a claimant's "work skills can be used in other work and the specific occupations in which they can be used." 20 C.F.R. § 404.1566(e). At a hearing, a VE may answer "a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2). May testified that Dzurko's previous position in health care administration is considered skilled work performed at a light level of exertion in the U.S. Department of Labor's *Dictionary of Occupational Titles*. R. 93. She also testified that Dzurko's work as a home health professional and as a CNA is considered semi-skilled work performed at a medium level of exertion. R. 93–94. May testified that some of the skills acquired in Dzurko's past work are transferable to other occupations in a health care setting, such as the coordination of people providing services. R. 94–95.

The ALJ posed several hypothetical questions to May regarding employment prospects for hypothetical individuals. May stated that a person with Dzurko's age, education, and work experience who was limited to not using the right foot on more than an occasional basis and not climbing ramps, stairs, ladders, ropes, or scaffolds on more than an occasional basis could not perform her past work either as she performed it or as it is generally performed in the national

economy. R. 95. The ALJ asked what jobs such a person might be able to perform, to which May answered by listing the jobs of a patient scheduler (5,000 positions in Illinois), referral clerk (5,400 positions), or general clerical work (96,000 positions). R. 95–96. In response to another hypothetical question from the ALJ, May stated that these same positions could be performed by someone who was additionally limited to positions involving no driving in which the person would avoid moderate exposure to extreme cold and unprotected heights and concentrated exposure to hazardous machinery. R. 97. When asked what positions would additionally involve only simple routine, repetitive tasks and would allow a person to be off task 10% of the day, May identified the jobs of hand packager (7,600 positions in Illinois at the sedentary level), mobile order clerk (19,000 positions), and assembler (5,000 positions). R. 98–100. In response to a question from Dzurko about how her narcotics use would impact such employment prospects, May replied that it would depend on the nature of the work and risk involved. R. 101. May indicated that it may be more acceptable at an unskilled level where new information would not be coming in, where "she would certainly be forgiven with prescription," but that the decision would ultimately lie with the employer. R. 101.

### E.     The ALJ's Decision

The ALJ issued a decision that Dzurko was not disabled, and therefore denied her disability insurance benefits. To evaluate whether Dzurko was entitled to benefits, the ALJ followed the five-step sequential inquiry that is prescribed by Social Security regulations. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five steps proceed as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or

11

equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (quoting *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). "A finding of disability requires an affirmative answer at either step three or step five." *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). In each of the first four steps, the claimant bears the burden of proof. *Weatherbee*, 649 F.3d at 569 (citing *Briscoe*, 425 F.3d at 352). The government bears the burden of proof at the final step and must present evidence establishing that the claimant's RFC, which is the most that the claimant can still do despite her limitations, enables her "to perform work that exists in a significant quantity in the national economy." *Id.* (citing 42 U.S.C. § 423(d)(2)(A); *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009)); 20 C.F.R. §§ 404.1545(a), 416.945(a).

Here, the ALJ determined at step one that Dzurko has not engaged in substantial gainful activity since February 9, 2009, which is the date that Dzurko claims she became disabled. R. 28. At step two, the ALJ determined that Dzurko suffers from the following severe impairments: obesity, arthritis, degenerative joint disease, avascular necrosis, and restless leg syndrome. *Id.*; *see also* 20 C.F.R. § 404.1520(c) (requiring a "severe" impairment, defined as an "impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities"). The ALJ noted that these listed impairments "cause more than minimal functional limitations" for Dzurko. R. 28. At step three, the ALJ determined that whether taken

alone or in combination, none of Dzurko's impairments meet or are medically equivalent to a listing in 20 C.F.R. Part 404, Subpart P, App. 1, meaning that she is not disabled based on step three grounds.

Prior to step four, the ALJ determined that Dzurko "has the residual functional capacity to perform sedentary work" except that she can perform no more than occasional "pushing, pulling, or operation of foot controls using the right foot" and "climbing of ramps, stairs, ladders, ropes, or scaffolds." R. 31. The ALJ additionally determined that Dzurko cannot drive and must avoid "more than moderate exposure to cold or unprotected heights" and "concentrated exposure to hazardous machinery." According to the RFC, Dzurko "is limited to work consisting of simple, routine, repetitive tasks" and would be off-task 10% of the workday. R. 31. The ALJ noted that Dzurko's records show improvement over time with conservative treatment despite her claim that she suffers from "24/7 pain"; Dzurko's testimony was "not given significant weight" because the ALJ found it "not well supported by the objective medical evidence." R. 36. Having made this determination, the ALJ concluded at steps four and five that while Dzurko is unable to perform her past work as a health care administrator or certified nurse aide, she is able to perform other work available in the national economy. R. 36–37. On that basis, the ALJ found that Dzurko is not disabled and is therefore ineligible for disability insurance benefits. R. 37–38.

The Appeals Council denied review, leaving the ALJ's decision as the final word of the Commissioner. *See Roddy*, 705 F.3d at 636. Dzurko now appeals the unfavorable decision.

## DISCUSSION

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability," defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or

that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the impairment or impairments must not only prevent the claimant from doing her previous work, but considering her age, education, and work experience, must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

The Social Security Act authorizes judicial review of the final decision of the Commissioner of Social Security. 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and the Commissioner's factual findings deferentially. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) (the Commissioner's factual findings are "conclusive" if supported by substantial evidence). The Commissioner's decision will therefore be upheld unless the findings are not supported by substantial evidence or the decision resulted from the application of an erroneous legal standard. *See Briscoe*, 425 F.3d at 351; *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt*, 395 F.3d at 744 (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)). The standard requires "more than a scintilla," but can be satisfied by "less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). A court "cannot uphold an administrative decision that fails to mention highly pertinent evidence." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

A court reviewing the Commissioner's decision reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the Commissioner. *See Schmidt*,

395 F.3d at 744; *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner; "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). In addition to meeting these standards, the Commissioner must articulate enough detail and clarity in the analysis to allow a reviewing court to conduct meaningful appellate review. *Briscoe*, 425 F.3d at 351; *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The Commissioner is "not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing *Steele*, 290 F.3d at 941).

If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is the appropriate remedy unless the evidence . . . compels an award of benefits." *Briscoe*, 425 F.3d at 355 (citing *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)). An award of benefits is only compelled "where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (quotation marks and citation omitted).

Dzurko argues that the ALJ's decision is erroneous and should be remanded because (1) her waiver of counsel for the administrative hearing was invalid and the ALJ failed to adequately develop the record; and (2) the ALJ disability determination was not supported by substantial evidence. The Commissioner argues that (1) even if Dzurko's waiver of counsel was invalid, the ALJ sufficiently developed the record; and (2) substantial evidence supported the ALJ's decision. The Court agrees that Dzurko's first argument warrants a remand, therefore consideration of the others is unnecessary.

Dzurko contends that the ALJ failed to obtain a valid waiver of counsel. An applicant for disability insurance benefits has a statutory right to be represented by counsel at a disability hearing. 42 U.S.C. § 406; 20 C.F.R. § 404.1700. While that right may be waived, the Seventh Circuit has stated that a valid waiver is only obtained after the ALJ explains to the *pro se* claimant "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994)). Dzurko argues that her waiver of counsel was invalid because she was not informed of the possibility of free counsel, contingency arrangements, and the limitation on fees to 25 percent of benefits due. She further argues that the right to representation notice that was mailed to her is misleading because it states that "[s]ome private lawyers charge a fee only if you receive benefits," when in fact no attorney may charge fees unless a claimant receives a favorable determination and the Social Security Administration (SSA) approves the fees.[3] The Commissioner does not argue that Dzurko's waiver of counsel was valid, effectively conceding that the waiver was insufficient.[4]

---

[3] Dzurko makes a mistake in this argument. She is correct that any attorney or other representative must obtain SSA authorization before charging or collecting a fee for services provided in a Social Security proceeding, and that the Social Security Act and Equal Access to Justice Act both require a favorable determination before such a fee may be authorized. *See* 42 U.S.C. §§ 406(b), 1631(d)(2); 28 U.S.C. § 2412. Still, the relevant sentence in the brochure actually states that "[s]ome representatives do not charge unless you receive benefits," without specifically referring to fees. R. 125. This is not necessarily inaccurate because representatives may still charge to be reimbursed for costs incurred in the representation, such as the cost of obtaining medical records, separate from charging fees for their services. In any event, the issue does not need to be decided here, given the Commissioner's concession.

[4] It is difficult to understand why the failure to adequately advise claimants before accepting a waiver of their rights to representation is ever an issue in view of the clear guidance that has been provided by the Seventh Circuit. Nevertheless, the ALJ did not mention the possibility of contingency arrangements or the cap on fees in eliciting Dzurko's verbal waiver or

*Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court."); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

A failure to secure a valid waiver of counsel does not automatically mean that the ALJ's decision will be reversed, but an ALJ who fails to obtain a valid waiver of counsel is under a heightened duty to develop the record. *Skinner*, 478 F.3d at 841 (citations omitted). The ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id.* at 841–42 (quotations marks and citation omitted). Additionally, where the ALJ fails to secure a valid waiver of counsel, the burden is on the Commissioner to show that the ALJ adequately developed the record, as there is no presumption that an unrepresented claimant has presented her best case before the ALJ. *Id.* at 842. A "significant omission" is usually required before a court will find that the ALJ failed to fully develop the record. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (quoting *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994)). An omission "is significant only if it is prejudicial." *Id.*

Dzurko does not argue, nor does this Court believe, that the ALJ performed a perfunctory hearing or omitted major areas of oral questioning. Instead, Dzurko's position is that the case should be remanded because the ALJ failed to acquire all relevant medical records. As Dzurko

---

in the signed acknowledgement letter. The record shows that this information was contained in the *Your Right to Representation* brochure that was apparently mailed to Dzurko on May 10, 2010, but the Commissioner does not argue, nor does any evidence in the record confirm, that Dzurko in fact received the brochure in this case. R. 123–26. One court in this district found that, despite shortcomings in the advice of rights provided to a claimant in a hearing before an ALJ, a valid waiver of counsel was achieved where the claimant had signed to acknowledge receipt of a similar written notice. *See Moore v. Astrue*, 851 F. Supp. 2d 1131, 1140–41 (N.D. Ill. 2012). This Court, however, need not consider whether *Moore*'s holding that an adequate signed waiver of rights form suffices given the Commissioner's concession.

points out, two sets of medical records are missing from the administrative record: (1) those of Dr. Bishop, who allegedly diagnosed Dzurko with RSD following her 2003 surgery; and (2) those of Dr. Paolucci, a podiatrist who Dzurko asserts treats her for RSD and avascular necrosis, and who referred her for pain management treatment by Dr. Morales. Failure to obtain all medical records is not necessarily grounds for remand. *See, e.g.*, *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987) ("While we sympathize with the claimant and her physical problems and we realize that she was diagnosed as totally disabled . . . in 1984, these diagnoses simply are not relevant to her physical condition some eleven years earlier when her insured status expired."). But failing to obtain the records of a treating physician who saw the claimant during the relevant insured period for an ailment that forms the basis of her disability claim is not harmless error. *See, e.g.*, *Vaile v. Chater*, 916 F. Supp. 821, 830 (N.D. Ill. 1996) (remanding for ALJ's failure to acquire medical records of treating physicians).

The Commissioner argues that (1) Dr. Bishop's records are too old to assist Dzurko in meeting the standard for disability; and (2) by failing to produce the contents of the records of Dr. Paolucci in support of her motion for summary judgment, Dzurko has failed to meet her burden to come forward with evidence that the ALJ could have obtained. The Commissioner's argument misinterprets the burden on the Commissioner given the concession that Dzurko's waiver was invalid. While courts generally uphold "the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation," *Nelms*, 553 F.3d at 1098, to "give teeth" to the requirement that ALJs adequately explain the right to counsel, the burden is shifted to the Commissioner to show that the ALJ adequately developed the record where the waiver of counsel is invalid, *Binion*, 13 F.3d at 245. After the Commissioner meets this burden, the plaintiff may rebut the showing by demonstrating prejudice or an evidentiary

gap. *Id.*; *see, e.g.*, *Beth v. Astrue*, 494 F. Supp. 2d 979, 1003 (E.D. Wis. 2007) (remanding where Commissioner failed to demonstrate adequate development of record); *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1053 (E.D. Wis. 2005) ("The Commissioner cannot fulfill that burden by arguing that the claimant has not brought forth 'missing evidence.'"); *Young v. Apfel*, 3:98-CV-206RP, 1999 WL 325026, at *9 (N.D. Ind. May 19, 1999) (same).

This case falls somewhere in the middle of the spectrum between an extreme case where the ALJ perfunctorily questions witnesses or leave complete gaps in the record of medical evidence, *see, e.g.*, *Nelms*, 553 F.3d at 1098 (holding that ALJ failed to adequately develop the record where he did not question *pro se* claimant about recent medical history despite two-year evidentiary gap), and a case in which all medical records are in the record and the ALJ sufficiently investigates, *see, e.g.*, *Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009) (finding record adequately developed where ALJ "requested updated records both before and after the hearing," despite confusion regarding location of treatment). Social Security regulations offer some guidance on what records are to be requested. They require that before a claim for disability is denied in cases where a claimant says that her disability began less than 12 months before she filed her application, a claimant's "complete medical history" is to be evaluated, defined as "the records of your medical source(s)" "beginning with the month you say your disability began." 20 C.F.R. § 404.1512. Here, Dzurko claims that her disability began February 9, 2009. She filed her application for disability on February 23, 2009; her date last insured is September 30, 2012. Pl.'s Mot. 2, Dkt. 17.

The Court first notes that the ALJ did attempt to acquire records from Dr. Bishop, who responded that Dzurko had not been seen since 2006 (apparently indicating that the office had no records to send). R. 431–35. It does not appear, however, that the ALJ attempted to obtain the

records from Dr. Paolucci, despite the fact that Dzurko reported to the ALJ that she was treated by Paolucci after May 5, 2010, for "two diseases that have no cure called R.S.D. and avascular necrosis," R. 261, and the appearance of Dr. Paolucci's name as the physician who referred Dzurko to Dr. Morales for pain management, R. 483–85. When asked if any records were missing from the record, Dzurko responded in the affirmative. R. 48. Dzurko's statement was vague, and it is not clear whether she was pointing to the absence of these particular records, but she did clearly indicate a concern that the ALJ have evidence regarding avascular necrosis and RSD in the right foot and ankle. *Id.* The ALJ otherwise developed the record regarding Dzurko's alleged pain syndrome, including noting Dzurko's history of complex regional pain syndrome ("CRPS"), a synonym for RSD, in other medical records.[5] The ALJ's opinion notes that records reflect that at one point in time, the CRPS was described as controlled, R. 32, and at another point in time, CRPS was only listed as a possible diagnosis, R. 35. Social Security Ruling 03-2p, which sets out guidelines for Social Security officials evaluating RSD/CRPS cases,[6] states that conflicting evidence in such cases is not out of the ordinary, and instructs that "[c]larification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources." 68 Fed. Reg. 59,971 (Oct. 20, 2003), 2003 WL 22399117.

The ALJ did not probe for clarification here, instead concluding that the conflicting evidence undermined Dzurko's credibility and claim. The missing records from Dr. Paolucci

---

[5] Complex regional pain syndrome is another name for reflex sympathetic dystrophy syndrome. *See Complex Regional Pain Syndrome Fact Sheet*, Nat'l Inst. Health (July 12, 2013), http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/detail_reflex_sympathetic_dystrophy.htm.

[6] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators . . . . While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal quotation marks and citations omitted).

may be significant to the resolution of this issue. Evidence of the limiting impact of RSD and avascular necrosis is central to Dzurko's overall assertion of disability and, importantly, the ALJ's assessment of her credibility regarding how her pain limits her functioning. *See* R. 36 (discounting Dzurko's credibility because her testimony was "not well supported by the objective medical evidence in the record"). It is possible that Dr. Paolucci's records may not indicate that Dzurko had RSD or CRPS with any greater certainty or severity, or that they may not show that her pain is any more limiting that the ALJ found it to be in her analysis.[7] The Court cannot assume either result, though, nor does the presumption that Dzurko made her best case before the ALJ apply given her *pro se* status. Even though the ALJ would not have to "explicitly pass judgment on every piece of evidence," this case underscores why "the better practice is to briefly address all the evidence militating in favor of a finding of disability and relied on by the applicant" because an unfavorable decision will almost certainly be appealed to the federal district court. *Vaile*, 916 F. Supp. at 831 (quoting *Cunningham v. Shalala*, 880 F.Supp. 537, 551 n.15 (N.D. Ill. 1995)). The determination is therefore remanded for consideration of the full record, including the records of Dr. Paolucci.

*     *     *

---

[7] Dzurko's failure to submit Dr. Paolucci's records for the limited purpose of proving prejudice may have been fatal to her argument had the Commissioner not conceded that her waiver of counsel was invalid, shifting the burden away from Dzurko, or alternatively had the Commissioner met her burden to show that the ALJ adequately developed the record. *See Nelms,* 553 F.3d at 1098 & n.1 (evaluating additional records for limited purpose of demonstrating prejudice); *Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009) (finding failure to demonstrate prejudice where claimant did not identify or provide additional evidence on appeal).

For the reasons set forth above, Dzurko's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. The case is remanded for further administrative proceedings consistent with this opinion pursuant to 42 U.S.C. § 405(g).

Date: December 26, 2013

John J. Tharp, Jr.
United States District Judge